[No. A064044. First Dist., Div. Four. Aug. 31, 1994.]

In re JOHN F., a Person Coming Under the Juvenile Court Law.
CONTRA COSTA COUNTY SOCIAL SERVICES DEPARTMENT,
Plaintiff and Respondent, v.
JUNE C. et al., Defendants and Respondents;
JOHN F., Appellant.

## COUNSEL

Sheila L. Brogna and Donna Wickham Furth for Appellant.

Victor J. Westman, County Counsel, and Valerie J. Ranche, Deputy County Counsel, for Plaintiff and Respondent.

No appearance for Defendants and Respondents.

## OPINION

ANDERSON, P. J.—We decide this case, although technically moot, to effect the legislative mandate for speedy resolution of the permanent status of dependent children. This case involves the rights of dependent children whose parents are no longer receiving reunification services and for whom adoptive parents or guardians are not generally forthcoming, but whose caretakers are likely to assume one of those roles if so approved upon completion of the mandatory home assessment. Our concern becomes acute where, as here, the county department of social services[1] recommends long-term foster care instead of guardianship or adoption primarily because it has not yet commenced the home study.

On this recommendation the juvenile court continued appellant John F. (John) in long-term foster care rather than ordering a Welfare and Institutions Code[2] section 366.26 hearing (section 366.26 hearing), at which the appropriate plan would be determined, i.e., adoption, guardianship or long-term foster care. Nearly a year later it turned down John's request, on a petition for modification, to set the hearing. John appeals from the order denying this request. Subsequent to commencement of his appeal the court did order a section 366.26 hearing. However, because of the importance of speedy permanency planning to dependent minors and the likelihood that

---

[1]Respondent herein is the Contra Costa County Social Services Department (Department).
[2]All statutory references are to the Welfare and Institutions Code.

this or similar situations may recur, we exercise our discretion to resolve the merits of this appeal. (*Liberty Mut. Ins. Co.* v. *Fales* (1973) 8 Cal.3d 712, 715-716 [106 Cal.Rptr. 21, 505 P.2d 213]; *In re Jody R.* (1990) 218 Cal.App.3d 1615, 1622 [267 Cal.Rptr. 746].)

■ We hold that when the court terminates reunification services at the 18-month review, it must direct a section 366.26 hearing unless it finds by clear and convincing evidence that the minor is not adoptable and there is no prospective guardian. If, as was the case here, the minor later establishes on petition for modification that the exception no longer pertains, the court must direct the section 366.26 hearing at that time.

## I. Facts

### A. *Background*

In May 1991, at age 22 months, John was hospitalized for failure to thrive. He weighed only 17 pounds and had the bone development of a 3-month-old. Later that month the Department petitioned to have John declared a dependent; the court ordered him detained on May 30, 1991, whereupon he was placed with his maternal aunt, Janet Rio, and her husband. He has remained with the Rios ever since.

Scheduled for June 6, 1991, the jurisdictional hearing did not actually convene until October 29, 1991, when John's parents entered no-contest pleas to three counts of an amended petition filed earlier that month. Specifically, they pled no contest to the allegation that John's hospitalization and diagnosis as a "failure to thrive infant" resulted from their failure to meet his nutritional needs. Father and mother each pled "no contest" to separate counts of injecting methamphetamines and of their continuing inability to provide appropriate care for their son due to ongoing substance abuse.

At the November 18, 1991, dispositional hearing, the court ordered a reunification plan encompassing substance abuse treatment, drug testing, mental health evaluation, counseling and parenting classes. The Department submitted a report which included letters from physicians outlining John's medical problems, the element of nutritional deprivation contributing to his sluggish growth, and the family dynamics that contributed to his poor nutritional status and development. The report further related that John was experiencing developmental and speech delays and had been accepted by the regional center as an "at risk" client. Regarding placement, the author observed: "John appears very happy in his placement, where he has been very well cared for by his aunt and uncle."

Five months later the Department, through John's social worker, reported that the parents' progress toward reunification was poor. Further, John had "adapted readily" to the Rios' home, and was making "great strides" under their care. "His progress is exemplary."

In the report for the combined 12- and 18-month hearing, the social worker again commented that the progress of both parents had been "slow," they had separated, and the mother was living in a homeless shelter and was connecting with recovery resources. However, placement of John with the Rios was "ideal." Additionally, John would need special education for his speech delay. Finally, the report included the Department's recommendation for long-term foster care and the observation that the Rios "are not prepared to become adoptive parents for John at this time, nor is there anyone willing or able to become his legal guardian. . . . [¶] Though the legal time frame for reunification services has expired, there is hope that indeed [the parents], will be able to enter John's life on a permanent basis, again, in the future."

The social worker then filed an addendum, clarifying that the previous reports reflected "ambivalence" of the caretakers about adopting John "because the mother was progressing in her recovery program. The maternal aunt, especially, realized the significance of adoption, that we are at the end of the legal time frame for reunifying with the mother and that this was her sister's child. Mr. Rio, however, was always adamant that he wanted to adopt John. These factors produced what appeared to be their ambivalence about adopting. However, I have worked with the caretakers around this issue and they are prepared to proceed toward adoption. The Department also feels they have provided excellent care for John and we recommend proceeding in this direction. (The Department recognizes this case is in 'red dot' status.)"[3] A second addendum reported that mother had entered a recovery program and recommended that John enter long-term foster care "pending the results of an adoption home study of the current caretakers. The Department will ask the Court to set a 366.26 hearing at a later date if it appears likely that the current caretakers can be approved for adoption or guardianship of the minor. [¶] Removal of the minor from the physical custody of his current relative caretakers is seriously detrimental to the emotional well-being of the minor. Proceeding to the 366.26 hearing at this time will adversely affect the minor's current placement."

At the combined 12- and 18-month review hearing held November 19, 1992, the juvenile court adopted the Department's recommendation for long-term foster care, terminated parental reunification services and found

---

[3]"Red dot" status is a departmental interpretation for "cases in permanent planning with potential adoption status."

"by clear and convincing evidence" that John was not adoptable and no one was prepared to serve as guardian. At the regular review hearing in April 1993 the court continued John in a permanent plan of long-term foster care.

Thereafter, mother petitioned for modification on the basis of her efforts at recovery and attendant lifestyle changes. John's counsel also petitioned for modification, (1) citing as changed circumstances that "there is someone willing to adopt" John, and (2) requesting the court set a section 366.26 hearing.

## B. *Hearing on the Modification Petitions*

On October 1 and 4, 1993, Sandra Perkins, John's social worker, testified as did Mrs. Rio. Perkins stated that mother had completed a residential program for substance abuse; participated in counseling; initiated drug testing; was living in an adequate mobilehome with her fiance, who supported her sobriety; and regularly visited her son. Despite this commendable progress, Perkins was "somewhat reluctant" to recommend another six months of reunification. In her opinion, she did not think John could be returned to the mother's home within this time frame. Perkins also expressed her "strong feelings" that a change of placement from the Rios' home would "detrimentally affect [John's] forward momentum."

John was thriving in his new home environment. Perkins described him as "happy, healthy," commenting that he "has made tremendous strides in his developmental processes."

Perkins also testified that John was adoptable, with a suitable family willing to adopt him. The Department's adoption unit had begun the home study on the Rios. Perkins further indicated she never felt that John was not adoptable, but was required to say so in her report, explaining that until the child was actually released for adoption, departmental policy required staff to state that the child was not adoptable. Apparently the Department had been reluctant to declare a child adoptable until the home study on the caretakers was completed. This reluctance in turn was due to the short 120-day period for completing the home study in time for the section 366.26 hearing.

Mrs. Rio then testified that she wanted to adopt John. At the close of the hearing, the Department stated that it now supported John's request to set a section 366.26 hearing.

The court denied both motions. In denying John's motion, the court stated it could not find that John would not benefit from a continuing relationship

with his mother. This being the case, the court elected to maintain John in a permanent plan of foster care and forgo the section 366.26 hearing.

## C. *Hearing on Reconsideration*

John's counsel moved for reconsideration; the Department did not oppose the motion. At the hearing counsel apprised the court that a section 366.26 hearing had never been held. He further explained that he did not object in November 1992 to a permanent plan of long-term foster care because Department staff told him that if he objected, of course he "could have a .26 hearing set, but that my client would be removed from this placement because it was not an already-approved . . . adoptable home." Therefore, he agreed "and allowed the Court to make this finding, even though everyone in the room knew it was not legally appropriate. . . . [¶] [T]he Department simply did not have the manpower and the time to do what the State mandated[—]to prepare a .26 report and have this child adopted by these people. And if they could not get it done in time and the child was freed for adoption, he'd have to be removed from their care until the adoptive home was found or their home study was done." Finally, counsel concluded that the true change of circumstances was that "with a lot of pushing" from himself, the social worker and the Rios, the home study had commenced.

The court still was not persuaded and denied the motion. Ruling from the bench, the court explained that it did weigh what would happen if further actions were taken in the case and it felt that termination of parental rights would be detrimental to the child.

## II. Discussion

John's first claim is that the juvenile court was without discretion to deny his request for a section 366.26 hearing. Indeed, he posits that the court was under a continuing sua sponte duty to order such a hearing after November 1992 when it terminated reunification services. Thus, there was no reason to actually "hear" John's section 388 motion; the court should have set a section 366.26 hearing on its own order.

This argument implicitly challenges the sufficiency of the evidence to support the court's November 1992 order and finding that John was not adoptable and no guardian was available—exceptions expressly found by clear and convincing evidence which eliminate the requirement of setting a section 366.26 hearing. ▮▮▮ John cannot, at this juncture, attack

this order because it was appealable in its own right,[4] and the time for appealing therefrom has passed. (*In re Megan B.* (1991) 235 Cal.App.3d 942, 950 [1 Cal.Rptr.2d 177].) We therefore proceed to the next level of analysis: whether the court had discretion to deny John's modification petition. This analysis necessarily entails some examination of the nature of the court's responsibility at the time of the combined 12- and 18-month hearing in November of 1992.

## A. *Statutory Framework*

This hearing was held pursuant to section 366.22 as a review occurring within 18 months of the date the court removed John from his parents' physical custody. (§§ 366.21, subd. (g)(1), 366.22.) The court's duty at the continued 18-month hearing in instances when it *does not* return the minor to his or her parent or guardian is as follows: "[T]he court shall develop a permanent plan. The court shall order that a hearing be held pursuant to Section 366.26 in order to determine whether adoption, guardianship, or long-term foster care is the most appropriate plan for the minor. *However, if the court finds by clear and convincing evidence, based on the evidence already presented to it that the minor is not adoptable and has no one willing to accept legal guardianship, the court may order that the minor remain in long-term foster care.* The hearing shall be held no later than 120 days from the date of the 18-month hearing. The court shall also order termination of reunification services to the parent. . . ." (§ 366.22, subd. (a), italics added.)

Thus, unless there are exceptional circumstances which justify the court's exercise of discretion to order long-term foster care,[5] the minor must receive a section 366.26 hearing. When mandating the hearing the court must further

---

[4]In making this determination, we distinguish between orders contemporaneous to an order setting a section 366.26 hearing and orders, such as this, that bypass the section 366.26 hearing and select long-term foster care as the minor's permanent plan. The latter are final and appealable under section 395 as orders subsequent to a judgment of dependency because nothing further is required to establish the permanent plan. On the other hand, the former are interlocutory and subsumed within the prohibition of section 366.26, subdivision (k): "An order . . . directing that a hearing pursuant to this section be held is not an appealable order, but may be the subject of review by extraordinary writ." Nonetheless, these contemporaneous orders, being *included within* the directive to set a section 366.26 hearing, are *reviewable on appeal* from the final order made at that hearing. (*In re Matthew C.* (1993) 6 Cal.4th 386, 401 [24 Cal.Rptr.2d 765, 682 P.2d 765].) The November 1992 order does not fit this bill.

[5]John, of course, contends there were not. Even if we were to agree with John that we could review the November 1992 findings in this appeal, we would decline review for lack of an adequate record. We have no transcript of that hearing and do not know what testimony, if any, was given, or what arguments or concerns were raised.

On the other hand, the Department, in a circuitous argument, seems to assert that even if there is no clear and convincing evidence of nonadoptability, the court can still forgo the

direct the social service agency to prepare an assessment on the following matters, among others: (1) review of the amount and nature of contact between minor and parents/extended family; (2) evaluation of minor's medical, developmental, scholastic, mental and emotional status; (3) preliminary assessment of the eligibility and commitment of prospective adoptive parent or guardian, including social history (screening for criminal records and prior referrals for child abuse or neglect); capability of person to meet minor's needs; and understanding of the legal and financial rights and responsibilities of adoption and guardianship; (4) description of the relationship of minor to the prospective adoptive parent or guardian, including its duration and character and the adult's motivation for seeking adoption or guardianship; and (5) analysis of the likelihood that the minor will be adopted if parental rights are terminated. (§ 366.22. subd. (b).)

Then, at the section 366.26 hearing, the court must review and consider the assessment and identify the permanent plan, whether it is (1) severance of parental rights and placement for adoption; (2) identification of adoption as the permanent plan goal without terminating parental rights, thereby affording additional time to locate an appropriate adoptive family; (3) appointment of a guardian for the minor; or (4) placement in long-term foster care. (§ 366.26, subd. (b).)

In this case John was moved into long-term foster care without the benefit of the assessment that is designed to serve as the focal point for the section 366.26 hearing and decision. Again, unless it is clear to the judge at the 18-month hearing that the child is not adoptable and there are no potential guardians, the minor is entitled to the section 366.26 hearing and the predicate assessment on the issue of adoptability and guardianship.

### B. *The Court Lacked Discretion to Deny John's Petition to Set a Section 366.26 Hearing*

Having been deprived of the section 366.26 hearing in November 1992, John could lodge a subsequent request (1) at the regular six-month review of the foster care arrangement (§ 366.3, subd. (c)), or (2) by petitioning for modification under section 388 to show changed circumstances. He chose the latter. Petitioner's burden on a section 388 motion is to show by a

---

section 366.26 hearing because at each subsequent six-month review, the court (or appropriate local agency) must evaluate whether the permanent plan remains appropriate. (§ 366.3, subd. (c).) Under this reasoning, if the trial court is persuaded at the section 366.3 hearing that long-term foster care is no longer the best plan, it can set the section 366.26 hearing at that time. The Department is incorrect. Under section 366.22 the court *must* order the section 366.26 hearing sua sponte unless the exception of nonadoptability and no prospective guardian is established by clear and convincing evidence.

preponderance of the evidence that modifying the extant order promotes the child's best interests. (§ 388; Cal. Rules of Court, rule 1432(f); *In re Stephanie M.* (1994) 7 Cal.4th 295, 317, 321 [27 Cal.Rptr.2d 595, 867 P.2d 706].)

 The dependency scheme is informed by a policy that respects the child's interest in belonging to a family unit and protects his or her right to "a placement that is stable, permanent, and that allows the caretaker to make a full emotional commitment to the child." (*In re Marilyn H.* (1993) 5 Cal.4th 295, 306 [19 Cal.Rptr.2d 544, 851 P.2d 826].) Consonant with this policy, long-term foster care is discouraged as a permanent placement solution for dependent children.[6]

Initially, and up to a possible 18 months, the dependency scheme gives precedence to the parent's interest in reunification. However, as recently underscored by our Supreme Court: "Once reunification services are ordered terminated, the focus shifts to the needs of the child for permanency and stability. . . ." (*In re Marilyn H.*, *supra*, 5 Cal.4th at p. 309.)

 The court here chose to continue the disfavored foster care placement *after* denying mother's request to reinstitute reunification, *after* receiving compelling evidence that the Rios were amenable to and available for guardianship or adoption, and *after* hearing testimony about the Department's "red dot" policy which in all likelihood was responsible for the November 1992 finding of nonadoptability. Concerned about the outcome of a section 366.26 hearing without the benefit of the home assessment or the Department's informed recommendation, the court deprived John of an earlier opportunity for a stable and permanent home. The court also commented on the relatively short 120-day period for setting the hearing. We infer from the court's remarks that this issue tied into its related concern about "the mother's progress and what happens to the mother. . . ."

These concerns, at that juncture of the dependency proceedings, were inappropriate. The statutory scheme limits the time in which children must wait for parents to demonstrate themselves capable of responsible parenthood. Here, reunification services had been terminated and the court failed

---

[6]Section 396 announces this policy: "It is the policy of the Legislature that foster care should be a temporary method of care for the children of this state, that children have a right to a normal home life, that reunification with the natural parent or parents or another alternate permanent living situation such as adoption or guardianship are more suitable to a child's well-being than is foster care, and that this state has a responsibility to attempt to ensure that children are given the chance to have a happy and healthy life, and that, to the extent possible, the current practice of moving children receiving foster care services from one foster home to another until they reach the age of majority should be discontinued."

to revive them. John's need for permanency and stability then became paramount and the court's focus should have veered to track those needs. (*In re Marilyn H., supra,* 5 Cal.4th at p. 309). The court did not have discretion to maintain John in the uncertainty of foster care by procrastinating and deferring decision on more permanent placement options *when it knew those options were not foreclosed.* The section 366.26 procedure was the door that would open up these options.

C. *The "Red Dot" Policy Frustrates the Goals of the Dependency Law*

 From county counsel's remarks at the section 388 hearing we gather that "red dot" status applies primarily to children who probably are not adoptable by the public "at large,"[7] but who ultimately may be adoptable because there is one family which expresses a desire to adopt. In these situations the Department pushes for a plan of long-term foster care because it is reluctant to invoke the "adoptability" label until it completes the home study on the child's current caretakers/prospective adoptive parents. Apparently, under the same rationale, the "red dot" status also applies to those who ultimately may be candidates for guardianship.

First, without question this policy thwarts the goal of the dependency scheme to honor children's needs for *prompt* resolution of custody status and a stable home environment. (See §§ 352 [standards for granting continuances] and 396.) To the contrary, its effect, at the pivotal review hearing, is to cause the social services agency to present less than a full picture of the child's circumstances and prospects, thereby hindering the court's ability to proceed at that time to a lasting placement solution. After all, it is the Department's job to prepare, for each review hearing, an updated report that includes a recommendation for disposition. (§ 366.21, subd. (c).) The court must review and consider this report. (§§ 366.21, subds. (e) & (f), 366.22, subd. (a).) Indeed, the court must control all dependency proceedings "with a view to the expeditious and effective ascertainment of . . . *all information relevant to the present condition and welfare of the child.*" (Cal. Rules of Court, rule 1412(a), italics added.)

 In turn, the Department, acting as an arm of the court in the best interests of the minor (*In re Danielle W.* (1989) 207 Cal.App.3d 1227, 1234 [255 Cal.Rptr. 344]), has a duty, in rendering its report and recommendation, to apprise the court of *all* relevant facts and circumstances concerning the

---

[7]For example, section 366.26. subdivision (c)(3), classifies a minor as "difficult to place for adoption" when "there is no identified or available prospective adoptive parent for the minor because of the minor's membership in a sibling group, or the presence of a diagnosed medical, physical, or mental handicap, or the minor is the age of seven years or more."

child including, where appropriate, the prospect that foster parents will step forward as adoptive parents or guardians. If the problem is completing the home study, that should be stated candidly so that the court has all the information necessary to choose the best path for the child from among the available options. Masking the problem as one of "nonadoptability" or no prospective guardian misleads the court. A judicial finding to this effect must be backed by clear and convincing evidence. (§ 366.22, subd. (a).) There is no clear and convincing evidence if the only basis for the finding is the agency's assessment of nonadoptability/no prospective guardian, which assessment is compelled solely by the agency's inability to complete a home study.

Second, it appears that the "red dot" policy was prompted by a misperception of the law and in particular the flexibility available to the court when rendering decision at the section 366.26 hearing. Indeed, at oral argument the Department articulated the assumption and concern that a child found adoptable at the section 366.26 hearing *must* be removed from present caretakers who have not yet been approved for adoption but hope to be, if there are qualified prospective adoptive parents waiting for a child. This is not the law; several other options are available to the court.

If the problem is not enough time to finish the home study within 120 days of the section seciton 366.26 hearing, that hearing, for good cause, could be continued. (§ 352.) Where the Department tries but cannot complete the study because of the press of a heavy caseload, and the current caretakers are amenable to becoming adoptive parents or guardians, good cause in all likelihood would be established.

Further, even if the assessment is incomplete in some respects, the court will look to the totality of the evidence; deficiencies will go to the weight of the evidence and may ultimately prove insignificant. (*In re Crystal J.* (1993) 12 Cal.App.4th 407, 413 [15 Cal.Rptr.2d 613].) Substantial compliance with the assessment provisions has been deemed enough. (*In re Diana G.* (1992) 10 Cal.App.4th 1468, 1481-1482 [13 Cal.Rptr.2d 645].)

Next, section 366.26, subdivision (j),[8] outlines another approach to, and is tailor-made for, situations where the concern is freeing the child for

---

[8]This statute presently provides: "Notwithstanding any other provision of law, the application of any person who, as a relative caretaker or foster parent, has cared for a dependent child for whom the court has approved a permanent plan for adoption, or who has been freed for adoption, shall be given preference with respect to that child over all other applications for adoptive placement if the agency making the placement determines that the child has substantial emotional ties to the relative caretaker or foster parent and removal from the relative caretaker or foster parent would be seriously detrimental to the child's *emotional*

adoption before the home study on a relative caretaker (such as the Rios) is completed. Where the child's continued well-being would be subverted by removal from the home of the relative caretaker, the social service agency must first attend to the relative's application and, if satisfactory, complete that home study before considering any other adoptive placement. Thus, under this statute, a child such as John would not be removed from the home of his relative foster parents upon severance of parental rights just because the home study is uncompleted.

Finally, as argued by the Department in support of John's modification motion, guardianship is another permanent choice that does not involve severance of parental rights, one of the very concerns that troubled the court in this case. (§ 366.26, subd. (b)(3).) Indeed, section 366.26, subdivision (c)(4), directs that "guardianship shall be considered before long-term foster care, if it is in the best interests of the child and if a suitable guardian can be found." Here, the Department indicated it might very well recommend guardianship, depending on the outcome of the assessment. In contravention of the values and goals embodied in the dependency law, the court's decision at least temporarily precluded consideration of such placement.

## III. DISPOSITION

The trial court erred because it had no discretion to deny John's request for a section 366.26 hearing. However, since we are informed that the court subsequently did set such a hearing, we would be performing an idle act by reversing the order and directing the court to do that which it has now done. Therefore, and for this reason only, we affirm the order.

Poché, J., and Perley, J., concurred.

---

well-being. [¶] As used in this subdivision, 'preference' means that the application shall be processed and, if satisfactory, the family study shall be completed before the processing of the application of any other person for the adoptive placement of the child." (§ 366.26, subd. (j), italics to show the term "emotional" was added to Stats. 1993, ch. 892, § 7, operative Jan. 1, 1994.)